UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------------------------------------  x
ROBERT CARTER,                                                :
                                                              :
                                 Petitioner,                  :
                                                              :
                    v.                                        :        25-CV-207 (SFR)
                                                              :
UNITED STATES PAROLE COMMISSION, et al.,                      :
                                                              :
                                 Respondents.                 :
------------------------------------------------------------  x
```

**MEMORANDUM & ORDER**

Petitioner Robert Carter is serving a two-year term of imprisonment in federal Bureau of Prisons ("BOP") custody at the Federal Correctional Institution in Danbury, Connecticut ("FCI Danbury"). Carter was imprisoned by the United States Parole Commission ("Parole Commission" or "Commission"), which has the authority to revoke terms of supervised release imposed by the D.C. Superior Court on people convicted of D.C. Code felonies. Carter petitions for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241, challenging the Commission's decision to require service of a prison sentence twice the high end of the recommended guidelines range after Carter violated the conditions of his supervised release by using drugs. Carter asserts that the Commission improperly imprisoned him for two years so that he would receive long-term drug treatment in BOP custody and violated the Due Process Clause and the Commission's internal manual in requiring him to serve a prison term above the guidelines range. For the reasons that follow, I conclude that Carter is entitled to resentencing because there are substantial grounds to believe the Commission imposed his prison term for the purpose of rehabilitation contrary to 18 U.S.C. § 3582(a) and the United

States Supreme Court's decision in *Tapia v. United States*, 564 U.S. 319 (2011). A writ will issue discharging Carter from BOP custody unless before August 7, 2025, the Commission conducts a new proceeding to determine the appropriate consequence for Carter's supervised release violation.

## I.    BACKGROUND

### A.    The Role of the United States Parole Commission

The United States Parole Commission ("Parole Commission" or "Commission") once played a leading role in deciding the length of time people convicted of federal offenses spent in prison. At sentencing, federal district judges would set the maximum term a person could spend in prison, and then the Parole Commission could exercise its discretion to release the individual on parole before that date. *See Parole Release Decisionmaking and the Sentencing Process*, 84 Yale L.J. 810, 814 (1975) (providing an extensive study of the federal parole system); Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 19 (1998) (observing that under the parole system, "parole authorities, not judges," determined "each federal prisoner's actual release date"). But the Commission's central role in federal sentencing came to an end with the passage of the Sentencing Reform Act of 1984, which made prison sentences more determinate and abolished parole prospectively for offenses committed after November 1, 1987. Sentencing Reform Act of 1984, Pub. L. No. 98-473, ch. II, §§ 218(a)(4), 235, 98 Stat. 2027, 2031.

In parole's place, Congress established the system of supervised release. In contrast to parole, "supervised release wasn't introduced to replace a portion of the defendant's prison term, only to encourage rehabilitation *after* the completion of his prison term." *United States v. Haymond*, 588 U.S. 634, 652 (2019) (plurality opinion) (citing Fiona Doherty, *Indeterminate*

*Sentencing Returns: The Invention of Supervised Release*, 88 N.Y.U. L. Rev. 958, 1024 (2013)); Stefan R. Underhill, *Supervised Release Needs Rehabilitation*, 10 Va. J. Crim. L. 1, 5, 8 (2024) (noting that the "legislative history of [the SRA] shows that Congress intended supervised release to focus on rehabilitation, not serve as an efficient mechanism for reimprisonment" and "[u]nlike parole and probation . . . supervised release is a term of supervision imposed *after* completion of a prison sentence; it is not a period of supervision *in lieu of* some or all of a prison sentence"). At sentencing, federal district judges may impose a term of supervised release to follow a term of imprisonment and, when a condition of supervised release is violated, may revoke supervised release and require an individual to spend additional time in prison. 18 U.S.C. § 3583(a), (e)(3).[1]

In 1997, Congress gave the Parole Commission a new mandate: in addition to continuing to oversee people on parole who were sentenced for offenses committed on or before November 1, 1987, the Parole Commission was granted authority over individuals convicted of offenses under the District of Columbia Code. *See* National Capital Revitalization and Self-Government Improvement Act of 1997, Pub. L. No. 105-33, § 11231, 111 Stat. 712, 745. In particular, the Parole Commission has authority to grant parole, establish conditions of release, and revoke parole for individuals serving sentences for D.C. Code felony offenses. 28 C.F.R. § 2.70. In addition, with respect to individuals serving terms of supervised release imposed by the D.C. Superior Court, Congress gave the Parole Commission the same authority

---

[1] Congress added the revocation power with the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1006, 100 Stat. 3207, 3207-6.

as that which is "vested in the United States district courts by paragraphs (d) through (i) of § 3583 of title 18, United States Code." D.C. Code § 24-133(c)(2).

Section 3583, enacted as part of the Sentencing Reform Act of 1984, governs supervised release for people sentenced by federal district courts. Paragraphs (d) through (i) delineate the court's authority to set and modify conditions of supervised release, terminate or extend supervised release, and revoke supervised release with a requirement to serve time in prison. 18 U.S.C. § 3583(d)-(i).

Accordingly, pursuant to D.C. Code § 24-133(c)(2), the Parole Commission has the same authority as federal district courts with respect to supervised release under 18 U.S.C. § 3583(d)-(i): the Commission may set and modify conditions of supervised release, terminate or extend supervised release, and revoke supervised release with a requirement to serve a term in prison. *See* 28 C.F.R. § 2.200(a)–(b); *see also Smallwood v. U.S. Parole Comm'n*, 777 F. Supp. 2d 148, 150 (D.D.C. 2011) (describing the Parole Commission's authority regarding supervised release). Thus, unlike individuals on supervised release who were sentenced by federal district courts, people on supervised release who were sentenced by the D.C. Superior Court and violate conditions of release do not appear before a judge for revocation proceedings. Instead, the revocation process is conducted entirely by the Parole Commission. Indeed, the Parole Commission can require service of a term of imprisonment after revoking supervised release.

The Commissioners appointed to the Parole Commission decide whether people who violate conditions of supervised release should go to prison and the length of the prison terms.[2] By statute, there can be no more than five Commissioners. Currently, there are only two.[3] A separate agency, the Court Services and Offender Supervision Agency, supervises individuals on parole or supervised release who are under the Parole Commission's authority. *See* 28 C.F.R. § 2.200(c).

The supervised release revocation process proceeds as follows. When an individual is alleged to have violated the conditions of supervised release, the Commission may issue a summons or warrant for the individual's arrest. Individuals arrested on a warrant will appear for a probable cause hearing conducted by a hearing examiner within five days. 28 C.F.R. § 2.214(a). If the hearing examiner determines there is probable cause that the person has violated a condition of release, the examiner will schedule a final revocation hearing. The Commissioners will determine whether an individual is released pending the revocation hearing. *Id.* § 2.214(g). The revocation hearing will be conducted either locally or at a correctional facility, depending on certain criteria. *Id.* § 2.215. The revocation hearing is presided over by a hearing examiner. 28 C.F.R. § 2.215(g).[4] The individual facing revocation

---

[2] Congress has regularly extended the period that the Parole Commission remains in operation. *See* Pub. L. 119-4, Div. A, Title I, § 1115, Mar. 15, 2025, 139 Stat. 15.

[3] *See* 18 U.S.C. § 4201(2)(c) (providing that the Commission is composed of no more than five members). The Parole Commission's website contains the profiles of the two Commissioners. *See* U.S. Parole Comm'n (Mar. 14, 2023), Acting Chairman Patricia K. Cushwa, https://www.justice.gov/uspc/staff-profile/patricia-k-cushwa; U.S. Parole Comm'n, Commissioner Charles T. Massarone (July 12, 2022), https://www.justice.gov/uspc/staff-profile/charles-t-massarone.

[4] "A local revocation hearing may be conducted by a hearing examiner or by any federal, state, or local official who is designated by a Commissioner to be the presiding hearing officer." 28 C.F.R. § 2.215(g).

has the right to appear at the hearing with counsel. *Id.* § 2.216(f). The inquiry at the hearing is focused on determining whether, by a preponderance of the evidence, the individual has violated one or more conditions of supervision, *id.* § 2.218(a), and the appropriate penalty for any violations, *id.* § 2.218(b).

After the revocation hearing, the hearing examiner prepares "a summary of the hearing that includes a description of the evidence against the releasee and the evidence submitted by the releasee in defense or mitigation of the charges, a summary of the arguments against revocation presented by the releasee, and the examiner's recommended decision." *Id.* § 2.216(h). The hearing examiner's summary, "together with the releasee's file (including any documentary evidence and letters submitted on behalf of the releasee)," is then given to another examiner for review. If two hearing examiners agree on a recommended disposition, the recommendation is submitted to a Commissioner for decision. *Id.* § 2.216(h).

After reviewing the examiners' recommendation, the Commissioners may revoke supervised release and require service of a prison term. The individual facing the possibility of imprisonment does not appear in front of the Commissioner deciding whether the person will go to prison and the length of any term. Instead, the sentencing decision is made on the papers.[5] Upon a Commissioner's review of the examiners' recommendation, that Commissioner's decision is sufficient to give effect to the recommendation of the hearing examiners. However, if a Commissioner disagrees with the hearing examiners, he must secure the concurrence of at least one other Commissioner. *Id.* § 2.218(g). An individual dissatisfied

---

[5] *See* 28 C.F.R. § 2.216(h) ("When two hearing examiners concur in a recommended disposition, that recommendation, together with the releasee's file and the hearing examiner's summary of the hearing, shall be submitted to the Commission for decision.").

with the decision of the Commissioners may appeal to the Parole Commission's National Appeal Board. *Id.* § 2.220. However, as there are currently only two Commissioners serving on the Parole Commission at this time, any appeal of a decision by the two Commissioners to depart from a recommendation of the hearing examiners necessarily returns to the same two Commissioners who decided to revoke supervision. *Id.* § 2.26(b)(2).

If the Commission revokes supervised release and requires service of a term of imprisonment, the prison term is set by reference to the Parole Commission's guidelines. *Id.* § 2.218(d). The Parole Commission's guidelines were designed to "establish a national paroling policy." *Id.* § 2.20(a); *see also* Doherty, *Indeterminate Sentencing Returns*, *supra*, at 993 (describing the guidelines as an effort to constrain the immense discretion enjoyed by the Parole Commission). The guidelines, which were designed to help the Parole Commission determine which individuals are suitable for release from prison on parole, consist of a grid with "offense severity" on one axis and "salient factor score" on the other.[6] The guidelines are modified only slightly when the Commission considers revocation of parole or supervised release. In particular, if the violation of conditions is administrative, offense severity is set at Category One; if the violation involves new criminal conduct, the offense severity category is the same as it would be if the person had been convicted of the conduct as their original offense.

---

[6] "A prisoner's [salient factor score] is calculated based on six scored items (Items A-E), which produce a score between 0 and 10. Item A counts all prior convictions or adjudications (adult or juvenile) for criminal offenses; Item B counts all prior commitments of more than 30 days (adult or juvenile) resulting from the Item A convictions or adjudications; Item C is determined based on the inmate's age at the time of the current offensive conduct; Item D is determined by whether the inmate had a 30-day sentence within the last three years; Item E accounts for whether the offense was committed while on probation or parole; and Item F accounts for whether the inmate was over 40 years old at the time of the offense." *Folks v. Beard*, No. CV ELH-21-1418, 2023 WL 6290833, at *4 (D. Md. Sept. 27, 2023) (citing 28 C.F.R. § 2.20).

*See* 28 C.F.R. § 2.21(a)(1). The salient factor score is calculated with the conviction or commitment from which the individual was released counted as a prior conviction/commitment. Otherwise, the guidelines designed for deciding how much time someone should serve *before* release on parole from prison are applied to determine how long someone should serve in prison *following* revocation. After considering the appropriate guidelines range, the Commission may impose a prison term above or below guidelines "when circumstances warrant." *Id.* § 2.21(d).

### B.    Factual Background

In 2009, Carter was convicted of First Degree Sexual Abuse in D.C. Superior Court and sentenced to ten years' imprisonment followed by five years' supervised release. Pet. ¶ 7; ECF No. 10-2, at 2. Carter began supervised release on July 14, 2017 after receiving credit for good conduct in prison and serving nine years and 24 days of his ten-year sentence. Pet. Br. 2.

#### 1.    Prior Revocation Proceedings

Carter has not been convicted of any crimes since he completed his prison sentence for his offense of conviction in 2017. Pet. for Habeas & Inj. Relief ("Pet."), ECF No. 1, ¶ 8. However, he has violated the conditions of his release multiple times. In January 2020, the Commission accepted an Expedited Revocation Proposal[7] and ordered Carter to serve a four-month term of imprisonment followed by a 60-month term of supervised release. The Commission's action followed Carter's acceptance of responsibility for failing to submit to drug testing and failing to complete sex offender and drug aftercare programs. ECF No. 10-4,

---

[7] An Expedited Revocation Proposal is a procedure by which an individual may waive a hearing and accept the Commission's proposed sanction. *See* ECF No. 19-1, at 172.

at 4. Carter had been discharged from those programs based on drug use (marijuana) and absences. ECF No. 10-3, at 3; ECF No. 10-2, at 2.

In July 2022, the Commission again accepted an Expedited Revocation Proposal, imposing another four-month term of imprisonment followed by 60 months of supervised release. The Commission's action followed Carter's acceptance of responsibility for failing to submit to drug testing, failing to report to his supervising officer, and failing to comply with location monitoring. ECF No. 10-6, at 2.[8]

In January 2023, the Commission issued a letter of reprimand asserting that Carter had failed to submit to drug testing, used drugs, and violated a condition relating to drug and alcohol after care. ECF No. 10-7, at 1. The Commission informed Carter that further noncompliance could result in his arrest and return to custody. *Id.*

In September 2023, Carter was arrested for alleged violations. Although the hearing examiner recommended Carter's release pending a revocation hearing, the Commission ordered him detained. ECF No. 10-8, at 3. At the revocation hearing, Carter admitted to charges of failing to submit to drug testing, drug use (marijuana), failing to complete a substance abuse program, and missing an appointment with his supervising officer. ECF No. 10-9, at 1-2. The hearing examiner observed that Carter had completed treatment at the Reentry and Sanctions Center ("RSC") but failed to attend virtual treatment sessions after he was unable to access wi-fi due to his inability to pay his bills. *Id.* at 3. The examiner recommended a term of

---

[8] Carter's violator warrant also alleged that Carter had been arrested for threats to do bodily harm and destruction of property. However, these charges were not considered with respect to the expedited revocation proposal, ECF No. 10-5, at 4-5, and were ultimately dismissed by the D.C. Superior Court, ECF No. 10-8, at 2.

imprisonment of three months, concluding the violations were "minor in nature" and Carter was "not a loss of contact, had stable residence, stable employment, completed treatment before, and is ready to attend again." *Id.* at 4. The Commission agreed, finding a decision below the guidelines was warranted because the violations were "minor in nature and you accept full responsibility for your actions." ECF No. 10-10, at 2. The Commission imposed a three-month term of imprisonment followed by supervised release for the rest of Carter's life. *Id.* at 1.

Carter was released from prison on October 23, 2023. ECF No. 10-11, at 3. Three days later, the Commission issued an arrest warrant charging Carter with failing to report to the RSC. *Id.* Although the hearing examiner recommended that Carter be released pending the revocation hearing, the Commission ordered Carter detained. *Id.* at 3. At the revocation hearing, Carter acknowledged that he had not reported to the RSC on October 24, 2023 as directed but did report two days later. Carter admitted to making a "poor choice," explaining he was at risk of losing personal property at a storage facility so decided to take care of that before reporting to the RSC. ECF No. 10-12, at 1-2. The examiner noted that RSC staff said Carter was doing "very well" at the RSC. The examiner stated that the time Carter had served in detention awaiting the hearing was sufficient to hold him accountable and recommended that the Commission find Carter's violation insufficient to revoke supervision. *Id.* at 2. In a Notice of Action issued one month later, the Commission accepted the hearing examiner's recommendation and ordered Carter released to the RSC. ECF No. 10-13, at 1.

### 2.    Revocation for Drug Use

The revocation proceeding that forms the basis for this § 2241 petition was initiated by a warrant issued on March 12, 2024 charging Carter with use of drugs. Carter had tested positive

multiple times in February 2024 for fentanyl and other substances. ECF No. 10-1, at 3. At a probable cause hearing on March 19, 2024, Carter's counsel explained that Carter had been very depressed following his brother's recent murder and had used drugs. ECF No. 2-6, at 7. The examiner concluded there was probable cause that Carter had violated a condition, but recommended bed-to-bed transfer to an inpatient substance abuse treatment facility rather than detaining Carter pending a revocation hearing. The examiner stated that Carter had recently overdosed on drugs and outpatient treatment was "clearly not sufficient." The examiner noted that the "only violation is his drug use" and Carter "appears to otherwise be working with [this supervising agency]." ECF No. 2-6, at 7. The Commission rejected the examiner's recommendation for a bed-to-bed transfer to an inpatient program and ordered Carter detained. ECF No. 10-1, at 5.

In the Prehearing Assessment completed before the revocation hearing, the examiner calculated Carter's guidelines range as 8 to 12 months based on an offense severity Category One and salient factor score 4. The examiner wrote:

> The Examiner at the Probable Cause recommended bed-to-bed transfer for in-patient treatment; however, that recommendation was denied by the Commission. The offender has a substance abuse problem and treatment programs recommended thus far have not proven effective. Based on the denial at Probable Cause for in-patient treatment, this Examiner assumes the next alternative would be punishment in the form of incarceration. To that end, it seems a term at the bottom of the guidelines is sufficient to dry the offender out and hopefully give him time to participate in drug programming to deal with his issues.

ECF No. 10-1, at 5.

A local revocation hearing was held on April 17, 2024. ECF No. 10-14, at 1. At the hearing, Carter's Community Supervising Officer ("CSO") said that Carter had been participating in treatment at the Nehimiah Project but had been found unresponsive following

a suspected overdose. Even after this occurred, the Nehimiah Project was willing to give Carter another chance. However, after Carter resumed treatment, he tested positive again for marijuana and fentanyl. *Id.* at 1. The CSO said he sought a warrant because he was concerned Carter presented a "threat to himself." *Id.* at 2. At the revocation hearing, Carter acknowledged his drug use, apologized for his actions, and said he needed help with his substance abuse. *Id.* Carter's counsel asked for a bed-to-bed transfer to an inpatient treatment program, noting his client had gone through withdrawal and was well positioned to start inpatient treatment. *Id.*

The examiner at the revocation hearing observed that the Commission had rejected the examiner's recommendation for a bed-to-bed transfer to inpatient treatment at the probable cause hearing and had also rejected an expedited proposal of eight months of imprisonment. Accordingly, the examiner recommended a 12-month term of imprisonment, followed by 60 months of supervised release. *Id.* at 3.

### 3.    Decision of the Parole Commissioners

Following the revocation hearing, the Commission rejected the hearing examiner's recommendation and ordered Carter to serve a term of imprisonment of 24 months. ECF No. 2-7, at 4. Commissioner Massarone was the first Commissioner to review the hearing examiner's recommendation. He wrote:

> The Commission finds that such person intentionally refused or failed to respond to any reasonable request of the Commission or supervision conditions. You are in need of long-term treatment provided by structural environment. Your own actions, not he [sic] USPC has shown your unwellness to respond to any reasonable treatment. The USPC considers along with the CSO, at this time, offender is a risk to himself and the community. There is no basis for early release on this case, furthermore long-term structural program provided by the BOP will assist your re-entry prior to release.

*Id*. Because Commissioner Massarone rejected the hearing examiner's recommendation, the other Commissioner needed to review the matter. 28 C.F.R. § 2.218(g). Commissioner Cushwa recorded her agreement with Commissioner Massarone's determination. ECF No. 2-7, at 4.[9]

A Notice of Action issued by the Commission on April 26, 2024 states that Carter's guidelines were 8 to 12 months but explains to Carter that an above-guidelines sentence is appropriate because "you are a poorer and more serious risk than your guidelines reflect based on your prior history of violence and failures on supervision." ECF No. 10-15, at 2. After summarizing Carter's four prior revocations and noting that the Commission had previously sentenced Carter within or below the guidelines for each prior revocation, the Notice of Action states that "[n]othing the Commission has done has deterred you from violating the terms of your supervised release" and "[t]he repeated instances of misconduct and the severity of your previous crimes justify departure above the guidelines since guidelines range determinations imposed previously have not kept you from violating." *Id.*

Carter appealed his sentence to the Commission's National Appeals Board. ECF No. 10-16, at 1. As noted, the Appeals Board is composed of only two Commissioners—the same two individuals who imposed the 24-month term of imprisonment. On appeal, Carter's counsel requested that the Commission order a bed-to-bed transfer to the Clean & Sober Streets inpatient drug-treatment program to allow Carter to participate in an inpatient treatment program with medication-assisted treatment, which he had not tried previously. ECF No. 2-3, at 7. On July 22, 2024, The Commissioners affirmed their prior decision to exceed the

---

[9] This document, titled Revocation Hearing Summary, does not specify the date that Commissioners Massarone and Cushwa made their decisions.

guidelines, finding that "the Notice of Action adequately explains the Commission's reasons for issuing a decision above the guidelines." ECF No. 10-16, at 1-2. The Appeal Notice of Action states that all of Carter's prior revocations had resulted in sentences that were at or below guidelines and identifies an additional factor it said supported an above-guidelines sentence: Carter committed the underlying offense conduct while using drugs, which made his continued use of drugs of increased concern for the Commission. *Id.* at 2.[10] The Appeal Notice of Action states that "the seriousness of your aggravating factors outweighs the mitigating factors," and thus the Commission had not erred in imposing a 24-month prison sentence. *Id.* at 3. Finally, the Appeal Notice of Action encourages Mr. Carter to "continue with mental health and drug treatment while incarcerated and to participate in inpatient treatment upon your release" and states: "The Board will order that the BOP assist you in any way possible as you continue to make strides in managing your mental health and drug issues." *Id.*

As of February 2025, almost a year after Carter was first incarcerated for his use of drugs, he had still not received drug treatment from the BOP. Pet. ¶ 79.

### C. Procedural History

Carter's attorneys filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 on February 11, 2025. Pet. ¶¶ 84-91. Carter moved for a preliminary injunction on the same day. Pl.'s Mot. for Prelim. Inj., ECF No. 2; Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. ("Pet. Br."), ECF No. 2-1. I ordered Respondents to show cause why the relief sought by Carter

---

[10] The Appeals Board noted: "[Y]ou admitted both in your PSI and at your revocation hearing your underlying offense conduct was committed while you were using drugs and in an impaired and altered state." ECF 10-16, at 2. Carter's counsel asserts that "while Mr. Carter admitted to using marijuana in the same general timeframe as the underlying offense nearly 18 years ago, there is no evidence that he was under the influence of drugs at the time of the underlying offense." Reply 2 (citing ECF No. 2-9).

should not be granted. ECF No. 8. Respondents filed a timely response to the Petition on February 28, 2025. Resp. to Order to Show Cause ("Resp."), ECF No. 10. Carter filed a reply on March 13, 2025. Pl.'s Resp. to Defs.' Resp. to Order to Show Cause ("Reply"), ECF No. 13. I heard oral argument on Carter's Petition on March 26, 2025. ECF No. 17.

## II.    <u>LEGAL STANDARD</u>

Carter petitions for a writ of habeas corpus on the grounds that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). "The statute traces its ancestry to the first grant of federal-court jurisdiction: Section 14 of the Judiciary Act of 1789 authorized federal courts to issue the writ of habeas corpus to prisoners who are 'in custody, under or by colour of the authority of the United States, or are committed for trial before some court of the same.'" *Rasul v. Bush*, 542 U.S. 466, 473 (2004) (quoting Act of Sept. 24, 1789, ch. 20, § 14, 1 Stat. 82). As Carter is imprisoned at FCI Danbury, this § 2241 petition properly names his immediate custodian (the Warden of FCI Danbury) and is brought in the district of his confinement. *Rumsfeld v. Padilla*, 542 U.S. 426, 442 (2004).

Challenges to the execution of a sentence are properly brought as § 2241 petitions. *Levine v. Apker*, 455 F.3d 71, 78 (2d Cir. 2006) ("A challenge to the *execution* of a sentence— in contrast to the *imposition* of a sentence—is properly filed pursuant to § 2241."). Courts have held that petitioners may use § 2241 to challenge the Parole Commission's actions in denying or revoking parole. *See, e.g.*, *Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001) ("A motion pursuant to § 2241 generally challenges the *execution* of a federal prisoner's sentence, including such matters as the administration of parole . . . ."); *United States v. Kennedy*, 851 F.2d 689, 690 (3d Cir. 1988) ("A challenge to the Parole Commission's execution of a sentence is properly raised in a *habeas corpus* petition under 28 U.S.C. § 2241."); *Martinez v. Williams*,

No. 3:18-cv-1109 (AVC), 2019 WL 13522151, at *3 (D. Conn. Mar. 7, 2019) (recognizing that challenges to decisions by the Parole Commission to revoke parole are properly brought under § 2241), *aff'd sub nom. Martinez v. Easter*, 818 F. App'x 104, 105 (2d Cir. 2020).

Although there are important differences between parole and supervised release, courts have held that a § 2241 petition is also the proper mechanism for challenging actions of the Parole Commission relating to supervised release revocation. *See, e.g.*, *Alston v. Stewart*, No. CV JKB-17-1339, 2018 WL 1069360, at *6 (D. Md. Feb. 27, 2018) (concluding that "Petitioner correctly brought this claim under § 2241," and observing that "[n]umerous courts have treated § 2241 as the appropriate vehicle for individuals who, like Petitioner, are D.C. Code offenders challenging the decision of the USPC to revoke their supervised release or parole"); *Rahim v. U.S. Parole Comm'n*, 77 F. Supp. 3d 140, 143 (D.D.C. 2015) (reviewing challenge to Parole Commission's revocation of supervised release under § 2241, and noting, in rejecting separation of powers argument, that the Parole Commission's jurisdiction "extends only to the execution of a judicially imposed sentence—that is, to determinations pertaining to parole and supervised release"); *McCleod v. U.S. Parole Comm'n*, 74 F. Supp. 3d 154, 157-58 (D.D.C. 2014) (describing the Parole Commission's power to revoke supervised release as incident to the Commission's authority over the execution of a criminal sentence).

Respondents do not contest the ability of a court in this District to entertain a § 2241 petition challenging a decision of the Parole Commission with respect to supervised release. Indeed, it appears that resort to this Court is the only mechanism for Carter to challenge the

Parole Commission's revocation decision as violating his federal Constitutional and statutory rights.[11]

## III.   DISCUSSION

### A.   Imprisonment for the Impermissible Purpose of Rehabilitation

Carter argues that the Parole Commission violated 18 U.S.C. § 3582(a) by imposing an above-guidelines sentence for the impermissible purpose of promoting rehabilitation through incarceration.

#### 1.   *Tapia* in the Context of Supervised Release

Congress enacted § 3582(a) as part of the Sentencing Reform Act of 1984. The provision specifies the "factors to be considered" when a court orders imprisonment:

> The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

18 U.S.C. § 3582(a). Section 3553(a)(2) directs a court to consider the following specified factors:

> (2) the need for the sentence imposed--
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;

---

[11] As discussed in section I.A, *supra*, any appeal of a decision of the Commission will necessarily return to the same two Commissioners who voted to revoke supervision and require incarceration. And although federal district courts generally lack jurisdiction to entertain collateral challenges to sentences imposed by the D.C. Superior Court, *Rahim v. U.S. Parole Comm'n*, 77 F. Supp. 3d 140, 145 (D.D.C. 2015), petitioners may challenge Commission actions via § 2241. *See, e.g.*, *Harris v. United States*, 148 F. Supp. 3d 1, 2 (D.D.C. 2015) (Jackson, J.) (stating that a petition challenging a Parole Commission's supervised release revocation decision should be brought under § 2241 in the district of confinement).

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. § 3553(a)(2).

In *Tapia v. United States*, the Supreme Court analyzed the interaction of § 3553(a)(2)(D), which lists rehabilitation as one of the purposes of punishment that a court should consider in sentencing a defendant, and § 3582(a), which provides that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 564 U.S. 319, 321-23 (2011). Justice Kagan, writing for a unanimous Court, began by situating § 3582(a) within the context of the Sentencing Reform Act of 1984 ("SRA"). The Court noted that the SRA eliminated the indeterminate sentencing regime, a system "premised on a faith in rehabilitation" that had fallen "into disfavor." *Tapia*, 564 U.S. at 324-25. Under indeterminate sentencing, the judge would set the outer limit of the prison term. The idea was that a person "should generally remain in prison only until he was able to reenter society safely." *Id.* at 324. In theory, after the prisoner's completion of various treatment programs in prison, "parole officials could 'determin[e] that [the] prisoner had become rehabilitated and should be released from confinement.'" *Id.* (quoting Stith & Cabranes, *supra*, at 18) (alteration in original). However, at the time Congress was considering the SRA, "[l]awmakers and others increasingly doubted that prison programs could 'rehabilitate individuals on a routine basis' or that parole officers could 'determine accurately whether or when a particular prisoner ha[d] been rehabilitated.'" *Id.* (quoting S. Rep. No. 98-225, at 40 (1983)).

The *Tapia* Court proceeded to analyze the text and structure of the SRA. The Court read the plain text of § 3582(a) to command that a court in "determining whether to impose a

term of imprisonment" and, "if term of imprisonment is to be imposed, determining the length of the term," 18 U.S.C. § 3582(a), "should consider the specified rationales of punishment *except for* rehabilitation, which it should acknowledge as an unsuitable justification for a prison term," *Tapia*, 564 U.S. at 326-27 (emphasis in original). This reading is in harmony with the structure of the SRA. The Court noted that the SRA similarly "bars the [United States Sentencing] Commission from recommending a 'term of imprisonment'—a phrase that again refers both to the fact and to the length of incarceration—based on a defendant's rehabilitative needs." *Id.* at 330 (citing 28 U.S.C. § 994(k)). Unlike with individuals on supervised release, who may be required to participate in designated treatment programs, courts have no power to order an incarcerated person to participate in rehabilitation programs, or indeed to guarantee the BOP will even admit an incarcerated person into a specific facility or recommended program. *Id.* at 330-31 (noting "BOP has plenary control, subject to statutory constraints, over the place of the prisoner's imprisonment, and the treatment programs (if any) in which he may participate") (internal quotation marks and citations omitted). Finally, the Court noted that this reading was consistent with the legislative history, which described Congress' view that rehabilitation "'is still important in determining whether a sanction *other than a term of imprisonment* is appropriate in a particular case.'" *Id.* at 332 (quoting S. Rep. 98-225, at 76-77 (1983)). Taken together, the Court determined that "text, context, and history point to the same bottom line: Section 3582(a) precludes sentencing courts from imposing or lengthening a prison term to promote an offender's rehabilitation." *Id.* at 332.

The *Tapia* Court concluded by applying its holding to the petitioner's case. The Court began by clarifying: "A court commits no error by discussing the opportunities for rehabilitation within prison or the benefits of specific treatment or training programs. To the

contrary, a court properly may address a person who is about to begin a prison term about these important matters." *Id.* at 334. Nonetheless, the Court found several indications that the sentencing court "may have selected the length of the sentence to ensure that Tapia could complete the 500 Hour Drug Program." *Id.* The sentencing court had remarked that any "sentence has to be sufficient . . . to provide needed correctional treatment, and here I think the needed correctional treatment is the 500 Hour Drug Program." *Id.* The sentencing court continued that its first priority was ensuring Tapia was imprisoned "long enough to get the 500 Hour Drug Program." *Id.* The Supreme Court concluded that "these statements suggest that the court may have calculated the length of Tapia's sentence to ensure that she receive certain rehabilitative services" and "that a sentencing court may not do." *Id.* at 335.

Justice Sotomayor, joined by Justice Alito, filed a concurrence that joined the Court's opinion in full but identified reasons to believe the sentencing court would have imposed the same sentence even had it not considered rehabilitation. The sentence was at the top of the guidelines range. *Id.* at 336. The sentencing court's remarks also suggested it was motivated by specific deterrence, a permissible factor for imposing a prison sentence. *Id.* Nonetheless, the concurring justices agreed that remand was appropriate given that the sentencing court's comments were not "perfectly clear" as to their motivation. *Id.* at 337.

In sum, Congress enacted § 3583(a) against the backdrop of deep skepticism about whether time in prison can or should be used to further a person's rehabilitation. *Tapia*, 564 U.S. at 331-32 ("According to that [Senate] Report, decades of experience with indeterminate sentencing, resulting in the release of many inmates after they completed correctional programs, had left Congress skeptical that 'rehabilitation can be induced reliably in a prison

setting.'") (quoting S. Rep. No. 98-225, at 38).[12] Under *Tapia* and pursuant to § 3583(a), a sentencer cannot put someone in prison for the purpose of the person undergoing rehabilitation while there. In other words, the decision to incarcerate cannot be motivated by a goal or expectation that rehabilitation will occur in the prison setting. Similarly, a sentencer may not lengthen a prison term for the purpose of accomplishing rehabilitation. A sentencer errs by lengthening a prison term based on goals or expectations about what form of rehabilitation will occur during that time spent in prison.

Following *Tapia*, the Second Circuit held that courts are also prohibited from revoking a term of supervised release for the purpose of promoting rehabilitation through incarceration. *United States v. Lifshitz*, 714 F.3d 146, 150 (2d Cir. 2013) ("We join our sister Circuits in finding *Tapia* applies upon revocation of supervised release, as well as at the time of initial sentencing. If imprisonment is 'not an appropriate means' of achieving rehabilitation when the court is initially sentencing a defendant, logic requires extending such reasoning to sentencing on revocation of supervised release.") (citations omitted). Section 3583(e) directs district courts to consider certain sentencing purposes—deterrence, incapacitation, and rehabilitation—in modifying the conditions of supervised release or extending, terminating or revoking supervised release.[13] In exercising their authority under § 3583(e), district courts are

---

[12] *Accord* Doherty, *Indeterminate Sentencing Returns*, *supra*, at 993 (describing the growing criticism of penal rehabilitation in the 1970s from a variety of sources); Stith & Cabranes, *supra*, at 30-37 (tracing the origins of the SRA and the decline of the rehabilitative ideal).

[13] Section 3583(e) instructs courts to consider the factors "set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)" in determining whether to modify, extend, terminate, or revoke supervised release. 18 U.S.C. § 3583(e). These factors include three of the four sentencing purposes set forth in 18 U.S.C. § 3553(a): the need for the sentence "to afford adequate deterrence to criminal conduct;" *id.* § 3553(a)(2)(B), "to protect the public from further crimes of the defendant;" *id.* § 3553(a)(2)(C); and "to provide the defendant with needed

cabined by § 3582(a)'s prohibition on courts choosing to incarcerate or lengthen a prison term for the purpose of furthering rehabilitation. *See Lifshitz*, 714 F.3d at 150.

Although this may be the first case considering a *Tapia* challenge to a Parole Commission determination, Respondents do not contest the proposition that the Parole Commission is bound by § 3582(a) and thus also prohibited from revoking supervised release or lengthening the prison term imposed for the purpose of promoting rehabilitation through incarceration. As noted, the statutory provision that governs revocation of supervised release by federal district courts, 18 U.S.C. § 3583(e), also governs the Parole Commission, D.C. Code § 24-133(c)(2). As the Parole Commission has the same authority as the federal district courts under § 3583(e), the Parole Commission is likewise bound by § 3582(a)'s prohibition.[14]

In its first published decision on *Tapia*, the Second Circuit noted that *Tapia* error is often evidenced by "the sentencing judge explicitly [tying] the need to impose a sentence of particular length to the defendant's ability to participate in a drug treatment program." *United States v. Gilliard*, 671 F.3d 255, 260 (2d Cir. 2012). Following *Gilliard*, the Second Circuit

---

educational or vocational training, medical care, or other correctional treatment in the most effective manner," *id.* § 3553(a)(2)(D). The Supreme Court held recently in *Esteras v. United States*, No. 23-7483, 2025 WL 1716137, at *6 (U.S. June 20, 2025), that district courts may not consider in revoking supervised release the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Justice Barrett, writing for the Court, reasoned that Congress had explicitly excluded § 3553(a)(2)(A) from the list of sentencing factors included in § 3583(e) and thus courts cannot consider retribution for the convicted offense in revoking supervised release. *Esteras*, 2025 WL 1716137, at *7.

[14] One of the structural considerations that animated the Court's ruling in *Tapia* holds true for the Parole Commission as well. Just as a district court lacks the authority to compel a person to participate in a rehabilitative program in prison or require the BOP to admit an individual into a given facility or program, so too the Parole Commission lacks the authority to do anything more than issue a non-binding recommendation to the BOP. *See* 18 U.S.C. § 3621(b).

remanded for *Tapia* error where the sentencing court remarked, "I will sentence you to sufficient time so that you can get treatment while in prison." *United States v. Keenan*, 499 F. App'x 81, 83 (2d Cir. 2012) (summary order). Similarly, the Second Circuit remanded where the sentencing court stated that the above-guidelines prison term it imposed was structured to "give sufficient time for a treatment program that will have a lasting impact." *United States v. Counterman*, 510 F. App'x 82, 83 (2d Cir. 2013) (summary order); *see also United States v. Neal*, 517 F. App'x 20, 22 (2d Cir. 2013) (summary order) (remanding where sentencing court said: "The other reason I'm upwardly departing is so that there can be sufficient time for you to get through these programs that I'm recommending and also to hopefully learn some sort of trade or occupation"); *United States v. Roper*, 545 F. App'x 17, 20 (2d Cir. 2013) (summary order) (remanding where a sentencing court described its chosen sentence as the minimum necessary for a defendant to qualify for treatment program).

In contrast, a passing reference to rehabilitation does not violate *Tapia* so long as the record does not indicate that the sentencing court decided to incarcerate or based the length of the prison term on a defendant's need for rehabilitation. Thus, in *United States v. Lifshitz*, the Second Circuit found no *Tapia* error where the sentencing court stated that "the most important factors" were "promoting respect for the law and protecting the public from further crimes of this defendant," and added that "[i]t also appears, although to a lesser extent, important to be sure that Mr. Lifshitz continues to get the type of medical care he is obviously in need of." 714 F.3d 146, 148 (2d Cir. 2013). In *Lifshitz*, the Second Circuit reasoned that, since *Tapia* itself said a sentencing court could discuss opportunities for rehabilitation within prison, there was

no sentencing error because there was "no indication in the record that the district court based the length of [the defendant's] sentence on his need for treatment." *Id.* at 150.[15]

Nor does a sentencing court violate *Tapia* by expressing hope that a defendant may be rehabilitated while incarcerated or mentioning programs the defendant may be able to pursue in prison. *United States v. Hunt*, 82 F.4th 129, 144 (2d Cir. 2023) (stating that an "expression of hope" for what will occur in prison "does not indicate that the district court had a rehabilitative motive in determining the proper sentence"); *United States v. Williams*, No. 23-6205, 2024 WL 3286651, at *3 (2d Cir. July 3, 2024) (summary order) (stating that "parting words of hope are neither repudiated by *Tapia*, nor inappropriate for a sentencing court to express to a defendant"); *United States v. Celelli*, 600 F. App'x 805, 806-07 (2d Cir. 2015) (summary order) (declining to remand where sentence clearly imposed based on specific deterrence and seriousness of offenses even though court also encouraged the defendant to

---

[15] The Second Circuit in *Lifshitz* observed that, notwithstanding evidence that the court "considered Lifshitz's need for medical care," the "sentencing colloquy demonstrates that the district court's primary considerations in sentencing Lifshitz were 'promoting respect for the law and protecting the public from further crimes of this defendant.'" *Lifshitz*, 714 F.3d at 150. At least one commentator has read this sentence in *Lifshitz* as establishing a "primary purpose test" and criticized such a test as an unfaithful application of *Tapia*. *See* Matt J. Gornick, *Finding* "Tapia *Error": How Circuit Courts Have Misread* Tapia v. United States *and Shortchanged the Penological Goals of the Sentencing Reform Act*, 69 Vand. L. Rev. 845, 867-69 (2016). However, the next sentence in *Lifshitz* concludes that there is "no indication in the record that the district court based the length of Lifshitz's sentence on his need for treatment." *Lifshitz*, 714 F.3d at 150. Accordingly, I do not read *Lifshitz* as requiring courts to parse what may have been a primary versus secondary purpose in determining the sentence. Rather, the relevant inquiry is whether the sentencer imposed or lengthened a prison term to promote a defendant's rehabilitation. *Tapia*, 564 U.S. at 332; *see also United States v. Vandergrift*, 754 F.3d 1303, 1310 (11th Cir. 2014) ("We decline to limit *Tapia* to situations where the district court either 1) specifically tailors the length of a defendant's sentence to permit completion of a rehabilitation program or 2) makes rehabilitation the 'dominant' factor in the sentencing court's calculus. Instead, we hold that *Tapia* error occurs where the district court *considers* rehabilitation when crafting a sentence of imprisonment.").

pursue treatment in prison); *United States v. Magner*, 455 F. App'x 131, 134 (2d Cir. 2012) (summary order) (declining to find *Tapia* error where it was "clear that the judge was emphasizing that in order to protect the public and incapacitate [the defendant] from repeating his offense, whatever rehabilitation Magner might be provided would have to occur in a secure environment"). Finally, the Second Circuit has found no *Tapia* violation where a sentencing court remarks on *past* benefits of incarceration. *Williams*, 2024 WL 3286651, at *3; *United States v. Williams*, 467 F. App'x 59, 62 (2d Cir. 2012) (summary order).

### 2. Evidence that Carter's Prison Sentence was Motivated by the Improper Purpose of Rehabilitation

Turning to the case at hand, my inquiry focuses on whether the Parole Commission imprisoned or lengthened Carter's prison term to promote rehabilitation. The Parole Commission has the same authority as a district court with respect to requiring the service of a prison term following a supervised release violation and must similarly comply with governing law.

Respondents suggest I am limited to reviewing only the reasons stated in the Appeal Notice of Action for evidence of an impermissible purpose. Resp. 15. In his briefing and at oral argument, Carter argued my review encompasses also the Notice of Action, the decision by Commissioner Massarone captured within the Hearing Summary generated on April 17, 2024 and agreed to by Commissioner Cushwa, and comments by Commission staff in transmitting their recommendations to the Commissioners.

I agree with Carter that I can look beyond what was stated in the Appeal Notice of Action for evidence of a *Tapia* violation.[16] In evaluating a *Tapia* claim, courts consider the entire record of the sentencing proceeding to determine if the sentencer was improperly motivated by rehabilitation in choosing to incarcerate or in lengthening the prison term. *See Tapia*, 546 U.S. at 334-35; *Hunt*, 82 F.4th at 144. The goal is to determine the actual purpose underlying the sentencer's choice. Although the Commission's sentencing procedure differs substantially from that of a United States District Court, I agree that in both inquiries the reviewing court's job is to assess the actual considerations that the sentencer relied upon in determining a prison sentence, not just whatever after-the-fact written record memorializes the decision. Thus, in addition to the Notice of Action and Appeal Notice of Action, I consider Commissioner Massarone's written response to the Hearing Summary generated by the hearing examiner on April 17, 2024, as well as the record of comments from counsel and Commission staff to the extent that they contextualize the decision made by the Commissioners. *See United States v. Williams*, No. 23-6205, 2024 WL 3286651, at *3 (2d Cir. July 3, 2024) (looking to arguments from counsel as context for sentencing court's statements).

Turning to the merits of Carter's *Tapia* claim, I find ample grounds for concern. Following the revocation hearing, in rejecting the hearing examiner's recommendation of a 12-month sentence and deciding instead to impose 24 months, Commissioner Massarone wrote

---

[16] The two out-of-circuit cases cited by Respondent do not address whether a court is limited to considering the rationale for revocation stated in the Appeal Notice of Action. *See Mun. Resale Serv. Customers v. FERC*, 43 F.3d 1046, 1052 n.4 (6th Cir. 1995) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), for the proposition that "we must judge the propriety of agency action solely by the grounds invoked by the agency"); *Solomon v. Elsea*, 676 F.2d 282, 290 (7th Cir. 1982) ("The accepted standard of review of parole determinations is whether the decision constitutes an abuse of discretion.").

that Carter had "failed to respond to any reasonable request of the Commission or supervision conditions" and was "in need of long-term treatment provided by structural environment." The Commissioner concluded by stating that the "long-term structural program provided by the BOP will assist your re-entry prior to release." ECF No. 2-7, at 4. Commissioner Massarone's decision was then agreed to by Commissioner Cushwa. *Id.*[17]

It appears that Commissioner Massarone deemed treatment in the "structural environment" of prison as necessary for rehabilitation and selected a prison term that was sufficiently "long-term" to achieve the treatment goal. In other words, a sentence above the 12-month recommendation was imposed to ensure that Carter received the "long-term structural program provided by the BOP" that the Commissioner perceived as necessary for rehabilitation. *See United States v. Mendiola*, 696 F.3d 1033, 1043 (10th Cir. 2012) (Gorsuch, J., concurring) (observing that repeated mentions of rehabilitation by the sentencing court supported the inference of a *Tapia* violation). True, the Commissioner did not explicitly tie the length of Carter's sentence to a *specific* rehabilitation program Carter could receive within BOP custody. But the Second Circuit has never stated that such an explicit connection between a specific treatment program and the term of imprisonment is necessary to find *Tapia* error. *See Gilliard*, 671 F.3d at 259; *Lifshitz*, 714 F.3d at 150. Moreover, although the Commissioner did not identify the specific name and length of a BOP program, the Commissioner referenced the "long-term structural program provided by the BOP" and set a sentence that aligns with the minimum sentence generally required for participation in the BOP's Residential Drug

---

[17] Following the sentencing decision of the two Commissioners, the Notice of Action was prepared. *See* ECF No. 10-15. After Carter's counsel challenged the decision, the Appeal Notice of Action was prepared. ECF No. 10-16.

Abuse Treatment Program (known as RDAP or the 500 Hour Drug Treatment Program)—
which is the BOP's long-term drug treatment program. *See* U.S. Dep't of Justice, Program
Statement 5330.11, Psychology Treatment Programs, at 9 (2016) (noting that the RDAP
program is ordinarily directed towards individuals with "24 months or more remaining on their
sentences"); *see also Mendiola*, 696 F.3d at 1042 (finding *Tapia* error where district court
varied upward to 24 months for the purpose of rendering defendant eligible for RDAP
program); *United States v. Taylor*, 679 F.3d 1005, 1006 (8th Cir. 2012) (finding *Tapia* error
where district court sentenced defendant to 24 months in prison and stated it was "using that
number because that makes him eligible to participate in the 500–hour drug program available
in the Bureau of Prisons").

But regardless of whether the Commissioner was motivated by RDAP eligibility, the
Commissioner's comments strongly suggest that he chose a 24-month rather than a 12-month
sentence because he believed Carter needed sufficiently "long-term" treatment in a prison
setting in order to rehabilitate. That reasoning is flatly prohibited by *Tapia*. *See Tapia*, 564
U.S. at 334 (stating that 3582(a) "prevents a sentencing court from imposing or lengthening a
prison term because the court thinks an offender will benefit from a prison treatment
program"); *Counterman*, 510 F. App'x at 83 (remanding where district court said sentence
"will give sufficient time for a treatment program that will have a lasting impact"); *United
States v. Olson*, 667 F.3d 958, 961 (8th Cir. 2012) (remanding for resentencing where district
court in imposing a consecutive sentence noted that the BOP "operates a treatment system that
the Court believes is frankly better than anything that the State of North Dakota offers" and
"the defendant is a person that really can't be trusted in the community without some
meaningful treatment"); *United States v. Vandergrift*, 754 F.3d 1303, 1309 (11th Cir. 2014)

("*Tapia* made clear that prison is not to be viewed by sentencing judges as rehabilitative"); *United States v. Thornton*, 846 F.3d 1110, 1113 (10th Cir. 2017) (holding that "a district court need not expressly link a prison sentence to a specific treatment program in order to trigger *Tapia* error" and finding error where sentencing court said "I am firmly convinced that he needs enough time in prison to get treatment and vocational benefits").

Nor are the references to rehabilitation any less concerning when considered in context. At issue was how to respond to Carter's repeated use of drugs despite multiple attempts at intervention by Carter's supervising officer and treatment providers. Carter's supervising officer thought that Carter should be transferred to an inpatient treatment facility—as did the hearing examiner at Carter's probable cause hearing. Following the probable cause hearing, the Commissioners rejected the examiner's recommendation that Carter be immediately transferred to an inpatient treatment facility. ECF No. 10-1, at 5. The Commissioners similarly rejected an expedited proposal by the hearing examiner for a sentence of eight months in prison.[18] ECF No. 10-14, at 3.

Carter's counsel focused at the revocation hearing on Carter's need for addiction treatment by urging the Commission to place Carter at an inpatient treatment facility. ECF No. 10-14, at 2. In submitting a recommendation following the revocation hearing, the hearing examiner noted the Commission's previous action in rejecting both inpatient treatment and an eight-month prison sentence. Focusing on the goal of Carter's rehabilitation, the hearing examiner wrote that a 12-month sentence would be "sufficient to dry the offender out and

---

[18] It is not clear if any explanations were given for these rejections. To the extent explanations were provided, they do not appear in the record.

hopefully give him time to participate in drug programming to deal with his issues." ECF No. 10-1, at 5.

Against this backdrop, the Commissioner's reference to treatment during incarceration strongly indicates the Commission's improper use of imprisonment for the purpose of furthering rehabilitation. In rejecting the suggestion that Carter pursue inpatient treatment, the Commissioner focused in particular on Carter's "unwellness to respond to any reasonable treatment." ECF No. 2-7, at 4. Although the meaning of these words is somewhat difficult to parse, it supports the inference that the Commissioner concluded that prison was needed to treat Carter's "unwellness." Finally, the Commission communicated to Carter that it was ordering the BOP to assist him with his mental health and drug issues,[19] although the Commission—like a sentencing judge—has no power to do so. 18 U.S.C. § 3621(b).

The Appeal Notice of Action, and indeed some of Commissioner Massarone's comments, suggest the 24-month sentence may also have been motivated by permissible considerations. These include specific deterrence. ECF No. 10-16, at 2 (noting that prior sentences within and below the guidelines had not changed Carter's behavior). The Commission could also permissibly consider incapacitation in deciding to incarcerate Carter. *Id.* at 3 (describing perceived similarities between the supervised release violation and the underlying offense conduct); ECF No. 2-7, at 4 ("The USPC considers along with the CSO, at this time, offender is a risk to himself and the community."). But I cannot assess from this record what role these permissible considerations played in the Commission's decision to sentence above the guidelines, or indeed to impose a prison sentence in the first place. *Tapia*,

---

[19] Appeal Notice of Action, ECF No. 10-16, at 3.

564 U.S. at 337 (Sotomayor, J, concurring) (recognizing that uncertainty as to motivations of sentencing court counsels in favor of remand); *Roper*, 545 F. App'x at 20 (same). In other words, I cannot assume that the Commission would have required Carter to spend 24 months in prison absent improper consideration of rehabilitation. *See United States v. Brown*, 935 F.3d 43, 48-49 (2d Cir. 2019) (describing the circumstances where remand for resentencing may be appropriate, including where the sentencer may not have understood the proper scope of its authority).

Accordingly, because there are substantial grounds to believe the Commission imposed Carter's prison term for the purpose of rehabilitation contrary to 18 U.S.C. § 3582(a), I conclude that Carter is entitled to resentencing under *Tapia* or release. Before determining the appropriate prison term, if any, the Commission shall hold a new hearing where Carter has the opportunity to present information relevant to whether he should be imprisoned and the length of any prison term—including information about his conduct and circumstances following the revocation hearing more than a year ago. *See Pepper v. United States*, 562 U.S. 476, 490 (2011) (holding that where a sentence is set aside on appeal, the sentencer at resentencing may consider evidence of the defendant's post-sentencing conduct). Thus, while the Commission need not establish again that Carter violated a condition of his supervised release, it shall reassess the appropriate consequence for the violation in compliance with *Tapia*.

In addition, in light of the Supreme Court's recent holding in *Esteras v. United States*, No. 23-7483, 2025 WL 1716137, at *6 (U.S. June 20, 2025), the Commission must not consider as a purpose of sentencing the need "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. §

3553(a)(2)(A). In other words, the Commission must not consider retribution for Carter's original offense in determining the sentence for his supervised release violation.

**B.    Carter's Claims that the Commission violated its Manual and Engaged in Unconstitutional Double Counting**

In addition to his *Tapia* claim, Carter argues that the Parole Commission, in requiring a prison term above the guidelines, violated its own internal Manual and engaged in impermissible double counting in violation of the Due Process Clause. At oral argument and in their briefing, Carter's counsel argued that if I find error in the Commission's sentencing decision, I should order immediate release as Carter has already served more than the guidelines range for his administrative violation of supervised release. According to Carter, "release, not remand" is the appropriate remedy "given there is no further lawful sentence the Commission can impose." Reply 5. In Carter's view, any above-guidelines sentence imposed at resentencing would necessarily violate the Manual and constitute impermissible double counting. I disagree for the reasons explained below. Therefore, I decline to order immediate release and instead require a new revocation proceeding.

**1.    Application of the Parole Commission Manual**

Carter argues that the Parole Commission Manual prohibits an above-guidelines sentence in his case. He seeks enforcement of the Manual, which he contends creates binding norms that affect the rights of individuals appearing before the Commission. Pet. Br. 13-17.

According to Carter, the Commission improperly required an above-guidelines sentence based on his "poorer parole risk." The Manual explains an above-guidelines determination may be appropriate for individuals deemed a "poorer parole risk." ECF No. 19-1, at 85-86. Carter asserts that the Manual allows above-guidelines sentences based on "poorer

parole risk" only if a person has both two or more prior revocations and more than nine prior commitments. Pet. Br. 13-17 (citing ECF No. 19-1, at 86). Because Carter does not have more than nine prior commitments, he asserts he cannot be deemed a "poorer parole risk."

I conclude that the Commission's Manual does not flatly prohibit an above-guidelines sentence in Carter's case. First, the governing regulations make plain that the Commission may issue an above- or below-guidelines sentence "when circumstances warrant." 28 C.F.R. § 2.21(d). Moreover, Section 2.20-05 of the Manual includes the following introductory remarks:

> The following are *examples* of situations in which a decision outside the guidelines appropriately may be considered. *This does not mean that these are the only situations in which a decision outside the guidelines may be considered.* Nor does it mean that a decision outside the guidelines is mandated for every such case.

ECF No. 19-1, at 85 (emphasis added). The Manual proceeds to include several examples of reasoning that could support an above-guidelines sentence because the defendant is a "poorer parole risk." One example is as follows:

> . . . because you are a poorer parole risk than indicated by your salient factor score in that you have repeatedly failed to adjust to previous periods of parole supervision. [*Note:* As prior revocation terms of more than 30 days are counted as prior commitments under Salient Factor Score Items B and C, a departure under this provision may be considered only when both of the following are present: (i) the subject has at least two prior revocations on the current sentence or consecutive/concurrent sentence(s); and (ii) the total number of prior commitments is more than nine. *See* 2.20-06(B).]

*Id.* at 86. The Manual next provides several other examples of circumstances where the Commission might conclude someone is a "poorer parole risk" that do not have the note

included in the first example regarding the number of revocations and commitments required.[20] The Manual then goes on to provide examples of reasoning the Commission might provide for someone being a "more serious parole risk."[21] These examples also do not reference any number of revocations and commitments someone must have before an above-guidelines sentence is appropriate.

Accordingly, the restriction that Carter references in the Manual does not apply to people the Commission deems a "more serious parole risk" and appears to apply to "poorer parole risk" designations only where the basis for concluding someone is a "poorer parole risk" is that the person "repeatedly failed to adjust to previous periods of parole supervision." Here, the Notice of Action rests on both "poorer parole risk" and "more serious parole risk." *See* ECF No. 10-15, at 2 (informing Carter that an above-guidelines sentence is warranted because he is "a poorer and more serious risk than your guidelines reflect based on your prior history of violence and failures on supervision"). I conclude that the Manual's restriction is not as broad as Carter asserts and does not provide an absolute bar on the Commission imposing an

---

[20] These examples include: ". . . because you are a poorer parole risk than indicated by your salient factor score: you committed a state firearms act offense while on bond in your present criminal case" and ". . . because you are a poorer parole risk than indicated by your salient factor score: [you have had an ongoing involvement in loan-sharking and extortion activities for the past 10 years] [you have admitted to on-going involvements in drug trafficking for the past 10 years]." ECF No. 19-1, at 86.

[21] One example is " . . . because you are a more serious parole risk than indicated by your salient factor score due to your extensive and serious prior record [*e.g.*, you have eight previous convictions for serious offenses (give specifics)]." ECF No. 19-1, at 87.

above-guidelines sentence in Carter's case.[22] Therefore, the Manual does not provide a basis for ordering immediate release rather than resentencing.

### 2.    Double Counting Claim

Carter argues that the Commission violated his due process rights because it gave undue weight to facts already considered by the guidelines as justification for imposing an above-guidelines sentence. Pet. Br. 8-12. Carter asserts that immediate release is required because the Commission cannot impose an above-guidelines sentence consistent with the Due Process Clause in his case. Reply 5.

As described in section I.A, *supra*, if the Commission opts to sentence a defendant to a term of imprisonment for violation of supervised release, it must determine a presumptive sentence by reference to the Commission's guidelines. 28 C.F.R. § 2.218(d). To set the guidelines range, the Commission must calculate a salient factor score, which purports to project a defendant's risk of recidivism by assessing prior convictions, prior commitments, age at relevant periods, and whether a defendant was on supervised release at the time of the offense. *Id.* § 2.20. The Commission cannot impose a sentence above the maximum term set by the D.C. Code. *See id.* § 2.219(a); *see also* D.C. Code § 24-403.01(b)(7). Still, the Commission retains discretion to impose an above- or below-guidelines sentence "when circumstances warrant." 28 C.F.R. § 2.21(d).

---

[22] I need not decide therefore whether the Parole Commission's Manual is binding on the agency. *See Services v. Dulles*, 354 U.S. 363, 388 (1957) (holding that an agency that adopts regulations that constrain its discretion more than required under statute must abide by the regulations); *Lynch v. U.S. Parole Comm'n*, 768 F.2d 491, 497 (2d Cir. 1985) (rejecting reading of Parole Commission Manual provision suggested by petitioner and suggesting Manual did not create enforceable rights).

In the context of parole release and revocation decisions, federal courts have reviewed Parole Commission decisions to vary from the guidelines for an abuse of discretion. *Iuteri v. Nardoza*, 732 F.2d 32, 37 (2d Cir. 1984). Courts have held that the Parole Commission abuses its discretion by "double counting," that is, applying a fact already considered in setting the guidelines range as justification for an above-guidelines determination. *See, e.g.*, *Alessi v. Thomas*, No. 85 CIV. 5651 (JFK), 1986 WL 2811, at *6 (S.D.N.Y. Feb. 25, 1986) ("The Commission's decision to incarcerate Alessi for thirty months, more than three times the suggested period of nine months, is based solely upon impermissibly double counted factors."); *Brach v. Nelson*, 472 F. Supp. 569, 574 (D. Conn. 1979) ("[A] reason which merely restates factors already computed in the salient factor score is improper."); *Lupo v. Norton*, 371 F. Supp. 156, 163 (D. Conn. 1974) ("It is simply irrational for seriousness of the offense to be used first to determine the appropriate guidelines period and then to be used again as the stated reason for confining a prisoner beyond that guideline.").

Nonetheless, the Commission may make a determination above the guidelines in some circumstances. For example, in a parole revocation case, the Second Circuit held that the Commission did not abuse its discretion in requiring more prison time than the guidelines provided where the petitioner's parole violations were close in time and his advancing age had not deterred his criminal conduct. *Martinez v. Easter*, 818 F. App'x 104, 106 (2d Cir. 2020) (noting "aggravating factors were far more egregious than the categorical factors that were taken into account warranting the initial calculation of Martinez's parole guidelines range"); *see also Ostrer v. Luther*, 668 F. Supp. 724, 731-32 (D. Conn. 1987) (noting, in setting parole release date later than guidelines recommended, that "[p]roperly considered 'aggravating factors' which rationally support a decision above the guidelines include the nature, frequency

36

and similarity of offenses, as well as the proximity of the current offense to prior offenses")
(citing *Bialkin v. Baer*, 719 F.2d 590, 594 (2d Cir. 1983)).

Thus, as a general matter, the Commission may impose an above-guidelines sentence
consistent with due process in revoking supervised release. However, as I have concluded that
Carter is entitled to resentencing under *Tapia*, I decline to decide whether the Commission
engaged in double counting in these proceedings. *See United States v. Brown*, 935 F.3d 43, 49
(2d Cir. 2019) (declining to address other independent grounds to vacate a sentence after
resolving that sentence must be vacated and remanded).

## IV.    CONCLUSION

Therefore, because the Parole Commission's decision to imprison Carter for 24 months
was not consistent with 18 U.S.C. § 3582(a) and *Tapia v. United States*, 564 U.S. 319 (2011),
a writ will issue discharging Carter from BOP custody unless before August 7, 2025, the
Commission conducts a new proceeding to determine the appropriate consequence for Carter's
supervised release violation. *See, e.g.*, *Billiteri v. United States Board of Parole*, 541 F.2d 938,
944 (2d Cir. 1976); *Alessi v. Thomas*, 620 F. Supp. 589, 596 (S.D.N.Y. 1985); *Brach v. Nelson*,
472 F. Supp. 569, 576 (D. Conn. 1979); *Lupo v. Norton*, 371 F. Supp. 156, 164 (D. Conn.
1974).

If the Commission seeks to resentence Carter, it shall hold a new hearing where Carter
has the opportunity to present information relevant to his sentence—including information
about his conduct and circumstances following the revocation hearing held more than a year
ago. If the Commission does not resentence Carter on or before August 7, 2025, the writ shall
issue. The parties shall file a joint status report with the Court on or before August 7, 2025

describing what action the Commission has taken, if any, and attaching the written record and

decision of any proceeding held.

SO ORDERED.

New Haven, Connecticut
June 23, 2025

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge